IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

| | | |
|---|---|---|
| CHUCK ROSS, et al., individually and on behalf of all others similarly situated, and all who have filed consent to suit forms in this case | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO.: WDQ-10-2804 |
| WOLF FIRE PROTECTION, INC. et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Chuck Ross, Robert Phillips, Michael D. Kelley, Stephen Kelley, and Anthony Smith ("the Plaintiffs") sued Wolf Fire Protection, Inc. ("Fire Protection"), James J. Wolf, and Timothy Strohmer ("the Defendants") for violating the Federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and Maryland wage and hour laws. For the following reasons, the Defendants' motion to dismiss or for summary judgment, construed as a motion for summary judgment, will be denied. The Plaintiffs' request to strike affidavits and for a protective order will be denied.

I.  Background[1]

Wolf is the president of Fire Protection and Strohmer is its vice president of operations. Compl. ¶ 6. Phillips worked for Fire Protection as a pipefitter for four years. *Id.* ¶ 29; Robert Phillips Aff. ¶ 3, Dec. 19, 2010. He installed sprinkler systems in new buildings. *Id.* Phillips, and Fire Protection's other pipefitters, worked in two person crews with a foreman who "had some level of authority over the pipefitter[]." *Id.* ¶ 4. The pipefitters and foreman were supervised by Strohmer and Mike Sudbrink. *Id.*

Phillips frequently worked with foreman Dominick Raum and "accompan[ied] him to the [Fire Protection] warehouse before going on-site to a job, for the purpose of picking up tools, equipment and supplies." *Id.* ¶ 5. The trips to the warehouse were "not directly on the way to the jobsite" and "extended [Phillips's] work days." *Id.* Phillips would also return to the warehouse at the end of a job or workday, and at the warehouse he was "required to load and unload the truck." *Id.* ¶ 6. Phillips states that he saw "many other foremen and pipefitters doing the same thing." *Id.* One morning, "Steve Kelly, a

---

[1] On summary judgment, the Plaintiffs' evidence "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The motion to dismiss will be construed as one for summary judgment because the parties have supported their briefs with documents outside the pleadings which the Court has considered. *See* Fed. R. Civ. P. 12 (d).

2

pipefitter, was lying in the back of a truck at the warehouse" when Sudbrink "told him to start working and to help load the truck." Id.

"[L]oading the truck frequently t[ook] a half hour or more" and "[o]ften the tools, supplies and equipment were heavy and required two or more people to load." Id. ¶¶ 9-10. Some of the equipment included "supplies, such as sprinkler heads" that "were so expensive that [Fire Protection] did not want them delivered directly to the job site" and so the employees "were required to pick them up at the warehouse, sign for them, and account for them." Id. ¶ 9. The equipment was "necessary for the [pipefitters'] work." Id.

Fire Protection "instructed [its] hourly employees that they were not to include travel time or truck loading time on their timesheets," and they were not paid for this time. Id. ¶ 12. Fire Protection required its employees to "arrive at the warehouse to pick up equipment early enough so that they could arrive at the jobsite by 7:00 a.m." Id. ¶ 7. Generally, this required Phillips and the other pipefitters to arrive at the warehouse by 5:30 a.m. Id.

In July 2010, Phillips consulted a lawyer about the FLSA. Id. ¶ 13. The lawyer gave Phillips a copy of the law, and Phillips then "spoke openly with [his] co-workers about the fact that [they] were not being paid for all hours worked." Id.

3

After his meeting with the lawyer, Mike Forstner, who was Phillips's foreman for the day, received a call from Sudbrink who told Forstner that Phillips "needed to 'shut [his] mouth.'" *Id.* That night, Strohmer called Phillips and said he needed to speak with him the next morning. *Id.* ¶ 14. At the meeting, Phillips "confronted . . . Strohmer about that fact that [the pipefitters] were not getting paid for all of [their] hours" and "explained that [Fire Protection] was supposed to . . . pay[] [them] for loading the trucks and the time traveling thereafter." *Id.* He offered Strohmer a copy of the FLSA. *Id.* Strohmer refused, called Phillips a "piece of shit," and fired him. *Id.*

On October 12, 2010, Phillips sued the Defendants for failure to pay wages under the FLSA and Maryland Wage and Hour Law, retaliation under the FLSA, and violations of the Maryland Wage Payment and Collection Act. ECF No. 1. The other Plaintiffs joined the suit by filing consent to suit forms.[2] *Id.*, Ex. 1.

On November 15, 2010, Fire Protection held a meeting in the parking lot outside its Glen Burnie, Maryland location where its lawyer, Laura L. Rubenstein, Esquire, "talked with [Fire

---

[2] The FLSA permits employees to maintain an action against their employer for unpaid wages on behalf of themselves and all others similarly situated. 29 U.S.C. § 216 (b). "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.*

4

Protection's] employees about [the] lawsuit." Laura L. Rubenstein Aff. ¶¶ 2-4, Jan. 28, 2011. Rubenstein, whom Wolf introduced to the employees as the "company attorney," "explained to the employees that . . . a group of former employees had filed a lawsuit . . . claiming that employees of the company were entitled to unpaid overtime." *Id.* ¶¶ 4-5. She told the employees that she was "investigating these claims and requesting their voluntary assistance to ascertain certain facts surrounding the lawsuit." *Id.* ¶ 6. At the end of the meeting, Rubenstein "distributed affidavits that reflected the product of [her] investigation" and "asked that the employees carefully read . . . the affidavits," change any language that was not "completely accurate" and "[i]f . . . they agreed with the contents of the affidavit and wished to sign it," she asked them to do so. *Id.* ¶¶ 5-10. Thirty three employees signed the affidavits. *See* ECF No. 5, Ex. 1.[3]

On November 17, 2010, the Defendants moved to dismiss or for summary judgment. ECF No. 5. Their motion was supported by the employee affidavits collected at the November 15, 2010

---

[3] The affidavits are nearly identical and state that the employees "voluntarily" drove with their foreman to the job site and on "some days" the foreman "stop[ped] by the [warehouse] to pick up or drop off supplies," which was a "preliminary process tak[ing] . . . approximately 5-10 minutes." ECF No. 5, Ex. 1. The affidavits also state that the employees "have never been instructed or directed to come to the [warehouse] before the start of the workday or at the end of the workday to pick up or drop off tools, equipment or supplies." *Id.*

5

meeting. On December 20, 2010, the Plaintiffs filed their opposition, which includes their request that the court strike the Defendants' affidavits and enter a protective order restricting the Defendants' communication with potential class members. ECF No. 10.[4]

II. Analysis

A. Standard of Review

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in h[is] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from

---

[4] The Defendants have responded to this request. ECF No. 15.

proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

B. The Defendants' Motion

The Defendants argue that summary judgment is appropriate on the Plaintiffs' FLSA claim for unpaid wages because (1) "[t]here is no evidence that any current or former employee of Wolf Fire Protection was improperly compensated or under-compensated for their work," (2) loading and unloading are non-compensable "pre and postliminary activities"[5] under the Portal-to-Portal Act of 1947, and (3) the activity was *de minimis*. Defs.' Opp'n 7-10.[6] The Plaintiffs contend that the FLSA mandates payment for time spent loading and unloading trucks and traveling between the warehouse and job sites because the loading and unloading were integral to the pipefitters' jobs. Pls.' Opp'n 6-9.

The FLSA was enacted to protect "the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Benshoff v. City of*

---

[5] Preliminary and postliminary activities are those "performed before or after the employee's principal activities." 29 C.F.R. § 790.5.

[6] The Defendants have not captioned ECF No. 5 as a motion for partial dismissal or partial summary judgment, and they have not addressed the Plaintiffs' claims for FLSA retaliation or for violations of Maryland wage and hour laws. Accordingly, the Court will not consider whether summary judgment is appropriate on those claims.

7

*Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (*quoting Tenn. Coal. Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)). It is "remedial and humanitarian in purpose" and "should be broadly interpreted and applied to effectuate its goals." *Id.* (internal citation and quotation marks omitted).

The Act mandates that employers pay a minimum wage to covered employees for each hour worked and pay overtime for work in excess of 40 hours per workweek. 29 U.S.C. §§ 206(a)(1), 207(a)(1). Because the FLSA does not define the term "work," a "recurrent question under the Act has been when the compensable workday begins and ends." *Sepulveda v. Allen Family Foods, Inc.*, 591 F.3d 209, 213 (4th Cir. 2009). "The question often arises whe[n], as here, employees perform some tasks before productive work begins." *Id.*

The Supreme Court has held that "work" is the "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *Tenn. Coal*, 321 U.S. at 598. Department of Labor regulations define the "workday" as "the period between the commencement and completion on the same workday of an employee's principal activity or activities" including "all time within that period whether or not the employee engages in work throughout all of that period." 29 C.F.R. § 790.6(b).

The Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262, which amended the FLSA, exempts from compensation certain activities that had been treated as compensable work. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25-26 (2005). It provides that employers are not required to pay employees for: "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities." 29 U.S.C. § 254 (a).

"[T]he term 'principal activity or activities' in Section 4 [of the Portal-to-Portal Act] embraces all activities which are an 'integral and indispensable part of the principal activities.'" *IBP*, 546 U.S. at 29-30 (alteration in original)(quoting *Steiner v. Mitchell*, 350 U.S. 247, 252-53 (1956)). Thus, activities "performed either before or after the regular work shift" remain compensable "if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1)." *Id*.

1. Loading and Unloading of Equipment

The Plaintiffs argue that loading and unloading equipment at the warehouse must be compensated as integral and indispensable to their principal activities because without the

9

tools and equipment they would have been unable to install sprinkler systems at the construction sites. Pls.' Opp'n 6-9. The Defendants argue that loading and unloading the equipment was not integral and indispensable, and regardless, it is not compensable under the FLSA because the process took only five to 10 minutes. Defs.' Mot. 7.

a. Compensation for *De Minimis* Activities

"As a general rule, employees cannot recover for otherwise compensable time if it is *de minimis*." *Perez v. Mountaire Farms*, 601 F. Supp. 2d 670, 683 (D. Md. 2009) (*quoting Lindow v. United States*, 738 F.2d 1057, 1061-62 (9th Cir. 1984)). "It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946).

Although some courts have suggested that an activity is *de minimis* if it does not exceed 10 minutes, *see Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir. 1994), here the Plaintiffs' claims are based on daily trips to the warehouse to load and unload equipment. *See Singh v. City of New York*, 524 F.3d 361, 371 (2d Cir. 2008)("whether the claimants performed the work on a regular basis" is one consideration in determining whether work was *de minimis*). Even if the Court accepted the 10 minute rule and the Defendants' assertion that loading the trucks took

no more than 10 minutes,[7] the aggregated time at issue exceeds 10 minutes, and the Defendants may not be granted summary judgment on the basis that the activity was *de minimis*. *Perez*, 601 F. Supp. 2d at 683-84.

### b. Integral and Indispensable Activity

The Defendants argue that the Plaintiffs "have never been instructed or directed to come to the [warehouse] before the start of the workday or at the end of the workday to pick up or drop off tools," so loading of equipment at the warehouse cannot be an integral and indispensable part of their jobs. Defs.' Mot. 7. The Plaintiffs contend that loading the equipment was integral because the equipment was necessary to installing sprinkler systems, and the Defendants required that they pick up the equipment at the warehouse. Pl.'s Opp'n 2-4.

An activity is "integral and indispensable" to the employee's principal activities if it is "(1) necessary to the principal work performed and (2) done for the benefit of the employer." *Perez*, 601 F. Supp. 2d at 676 (*citing Alvarez v. IBP, Inc.*, 399 F.3d 894, 902-03 (9th Cir. 2003)).

The parties do not dispute that the Plaintiffs' principal work was sprinkler system installation. *See* Defs.' Mot. 6;

---

[7] From Phillips's affidavit a reasonable fact finder could conclude that loading the trucks took more than 10 minutes. He states that "time spent at the warehouse" could last "over an hour" and "frequently t[ook] a half hour or more." Phillips Aff. ¶ 10.

11

Pls.' Opp'n 2. Phillips's affidavit is that the equipment he loaded and unloaded included items "necessary" to installing the sprinkler systems, such as the sprinkler heads, and because this equipment was expensive, Fire Protection "did not want [it] delivered directly to the job site" and "required [employees] to pick the[] [equipment] up at the warehouse, sign for [it], and account for [it]." Phillips Aff. ¶ 9.

From the evidence in Phillips's affidavit, a reasonable factfinder could conclude that Phillips needed the equipment loaded at the warehouse to complete his job (the first part of the "integral and indispensable" inquiry).[8] From his testimony that Fire Protection did not want expensive items delivered directly to the job sites, and required that the pipefitters pick up and sign for the equipment, a reasonable factfinder could conclude that the loading and unloading was "done for the benefit of the employer."[9] It is genuinely disputed whether Fire Protection required the plaintiffs to load and unload equipment, and whether the loading and unloading was "integral" to their "principal activity" requiring compensation under the FLSA.

---

[8] See Singh, 524 F.3d at 370 n.7 ("carrying inspection materials is arguably integral and indispensable because the paperwork is essential for inspectors to complete a field inspection.").

[9] See Epps v. Arise Scaffolding & Equip., Inc., 2011 WL 1566004, at *6-8 (E.D. Va. Feb. 17, 2011)(loading tools before traveling to worksite may be a compensable principal activity when company policy prohibited employees from leaving the tools in their vans, and the tools were needed to complete their work).

12

2.  Travel Time

The Defendants argue that the Plaintiffs' "voluntary carpooling" while "transporting tools, equipment and supplies" is not compensable under the FLSA. Defs.' Reply 4. The Plaintiffs contend that because their workday started with loading the trucks at the warehouse, they must be compensated for all subsequent travel time within the workday. Pls.' Opp'n 3-5.

The Portal-to-Portal Act did not change the "continuous workday" rule that "any walking, riding, or traveling time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity . . . is covered by the FLSA." *Epps*, 2011 WL 1566004, at *5 (internal quotation marks omitted). Applicable regulations provide that:

> Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday must be counted as hours worked. Where an employee is required to report to a meeting place . . . to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice.

29 C.F.R. § 785.38.

As discussed above, Phillips's affidavit that Fire Protection required him to report to the warehouse to load and sign out expensive equipment Fire Protection did not want delivered directly to the job site creates a genuine dispute

13

whether the loading and unloading was a principal activity. Viewing the evidence in the light most favorable to the Plaintiffs, it also creates a genuine dispute about whether travel from the warehouse to the job site and the return to the warehouse at the end of the day are "part of the day's work" requiring compensation under the FLSA.[10] The Defendants' motion for summary judgment on the Plaintiffs' FLSA unpaid wages claim will be denied.[11]

C. Plaintiffs' Request to Strike and for Protective Order

Included in their opposition to the Defendants' motion is the Plaintiffs' request for a protective order "prohibiting further unapproved contact with potential class members" and to strike the affidavits collected at the November 15, 2010 meeting. Pls.' Opp'n 16. The Plaintiffs also seek an order

---

[10] 29 C.F.R. § 785.38. See also Smith v. Aztec Well Servicing Co., 462 F.3d 1274, 1289 (10th Cir. 2006)("If the plaintiffs' first principal activity took place at the Sundial convenience store before traveling to the well site, and their last principal activity took place at the Sundial after returning from the well site, then . . . their travel time would be included in their workday.").

[11] The Defendants also argue that the FLSA claim must be dismissed against Wolf and Strohmer because the Plaintiffs have not pled facts showing a basis for piercing the corporate veil under Maryland law. Defs.' Reply 2-3. The claims against Wolf and Strohmer will not be dismissed on that basis. See Pearson v. Prof'l 50 States Prot., LLC, 2010 WL 4225533, at *4-5 (D. Md. 2010) (the "weight of authority" holds that the court need not pierce the corporate veil to "find [corporate officers] personally liable for FLSA violations"; "individual liability of a corporate officer or shareholder is dictated by the economic reality of the employment relationship" and "[t]he extent of that relationship may be addressed as discovery progresses").

14

requiring the Defendants to issue a curative notice to all "past, present, and future" employees. Id.

The Plaintiffs argue that collection of the affidavits was "not merely an attempt by [the] Defendants to investigate the facts of the present case" but "a blatant attempt . . . to stave off a wave of additional plaintiffs" and "subvert the proper function of this class action." Id. 15. The Defendants contend that they did not attempt to coerce employees or subvert the class action process, and the order the Plaintiffs seek is premature and overbroad. Defs.' Reply 6-13.

"[A]n order limiting communication between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for limitation and the potential interference with the rights of the parties." Gulf Oil v. Bernard, 452 U.S. 89, 101 (1981). "[T]o the extent that the district court is empowered . . . to restrict certain communications in order to prevent frustration of the policies of Rule 23, it may not exercise the power without a specific record showing by the moving party the particular abuses by which it is threatened." Id. at 102.

Applying Bernard, courts have required that before a protective order issue, the moving party show that (1) "a particular form of communication has occurred or is threatened" and (2) "the particular form of communication at issue is

15

abusive in that it threatens the proper functioning of the litigation." *Cox Nuclear Med. V. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 697-98 (S.D. Ala. 2003) (collecting cases). A communication is sufficiently abusive to warrant a protective order if it seeks to coerce prospective class members into excluding themselves from the litigation, contains false, misleading or confusing statements, or undermines "cooperation with or confidence in class counsel." *Id.* at 698 (collecting cases).

Here, it is undisputed that the Defendants communicated with potential class members, their hourly employees, at the November 15, 2010 meeting. Thus, the Plaintiffs have shown that a particular form of communication has occurred. *Id.* The Plaintiffs contend that this communication warrants a protective order because it was an attempt to coerce class members to opt-out of the litigation. Pls.' Mot. 14-15.

"Coercion of potential class members by the class opponent may exist if both parties are involved in an ongoing business relationship," and some courts have found "the danger of such coercion between employers and employees sufficient to warrant the imposition of [communication] restrictions." *E.E.O.C. v. Morgan Stanley & Co.*, 206 F. Supp.2d 559, 562 (S.D.N.Y. 2002). However, generally an employer may ask its employees about "the issues animating [a] lawsuit, or . . . request that they sign

16

declarations." *Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1229 n.15 (S.D. Ala. 2008). "[A] defendant in a [FLSA class] action is not categorically forbidden from communicating with prospective opt-in plaintiffs," but is "free to [appropriately] communicate with unrepresented prospective class members about the lawsuit and even to solicit affidavits from them concerning the subject matter of the suit." *Id.* at 1225-26; *Parks v. Eastwood Ins. Servs., Inc.*, 235 F. Supp. 2d 1082, 1085 (C.D. Cal. 2002).

Although the Defendants' communication with the potential class members is not a concern, their failure to inform the employees at the November 15, 2010 meeting that this is a class action suit which they might be entitled to join is troubling because the affidavits included statements which could prevent the employees from joining the class.[12] It is also troubling that Rubenstein was introduced as the company's attorney and told the employees that "they could feel free to contact [her

---

[12] The affidavits asked the employees to state that they had never submitted timesheets showing fewer hours than those actually worked, and that Fire Protection did not require them to pick up or drop off tools at the warehouse. *See* Defs.' Mot., Ex. 1; *Jones v. Casey's Gen. Stores*, 517 F. Supp. 2d 1080, 1088-89 (S.D. Iowa 2007)("one-sided, misleading communications with putative opt-in collective members . . . could easily have the effect of tainting the entire putative class and jeopardizing the entire litigation").

about] the affidavit," but it appears that employees were not advised that she did not represent them. See id. ¶¶ 4, 12.[13]

However, the record does not demonstrate a "blatant attempt" to subvert the class action process, or show the bad faith typically present in cases in which broad protective orders, such as the one sought by the Plaintiffs, have been issued.[14] There is no indication that the Defendants will engage in bad faith tactics in the future. The broad order sought by the Plaintiffs is unwarranted. See Longcrier, 595 F. Supp. 2d

---

[13] See Md. R. Prof'l Conduct 4.3 ("In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When a lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding").

[14] The Plaintiffs rely on Sjoblom v. Charter Commc'ns, LLC, 2007 WL 5314916 (W.D. Wis. Dec. 26, 2007). The conduct here is distinguishable from Sjoblom. In that case the court issued a protective order requiring pre-approval of all communications based on its determination that the employer-defendant had "questioned and obtained declarations from [employees who were] potential class members" under the guise of a required training program, instead of disclosing that the declarations would be used to defend in the class action suit that the declarants had a potential interest in. Sjoblom, 2007 WL 5314916, at *3-5. Here, there is no evidence that the Defendants lied to the employees, and Rubenstein's affidavit shows that she informed the employees that the decision to sign the affidavit was voluntary and would not affect their employment with Fire Protection. See Longcrier, 595 F. Supp. 2d at 1231 ("An across-the-board ban on communications with putative class member may be appropriate where the abusive contact consists of telling lies to persuade an employee not to opt in, threatening an employee with discharge if she does opt in, falsely disparaging plaintiff's counsel" or "similarly egregious conduct that may poison the litigation at its core.").

18

at 1231. However, future misleading communications with potential class members will result in the issuance of a protective order.

The Court will not strike the affidavits. Counsel may depose the employees who signed them about the circumstances under which they were signed and whether the employees agree with the statements. The Court will consider the appropriateness of a curative notice if and when a class is certified, at the Plaintiffs' renewed request.

III. Conclusion

For the reasons stated above, the Defendants' motion for summary judgment will be denied without prejudice to re-filing after discovery. The Plaintiffs' request to strike and for a protective order will be denied.

\_\_\_6/27/11_____  \_\_\_/s/_____
Date                                 William D. Quarles, Jr.
                                     United States District Judge